755 So.2d 845 (1999)
STATE of Louisiana
v.
Julius LUCKY.
No. 96-KA-1687.
Supreme Court of Louisiana.
April 13, 1999.
Rehearing Denied September 17, 1999.
Dissenting Opinion September 17, 1999.
*847 Linda Davis-Short, Gretna, Denise Le-Boeuf, New Orleans, Paula M. Montonye, for Applicant.
Richard P. Ieyoub, Attorney General, Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Kim K. McElwee, Ronald D. Bodenheimer, Gretna, for Respondent.
Dissenting Opinion of Chief Justice Calogero, September 17, 1999.
LEMMON, Justice.[*]
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The principal issues involve the denial of defense counsel's challenge for cause based on a prospective juror's ability to consider a recommendation of life imprisonment, and the discharge of an entire panel of seven prospective jurors based on remarks made by one of the prospective jurors. Other issues addressed are the admissibility of statements made by defendant and his accomplice, and the propriety of a remark made by the prosecutor during the guilt phase rebuttal argument.[1]

*848 Facts

On August 6, 1994, defendant and his accomplice, after completing their evening shift as dishwasher and cook at a restaurant, remained in the restaurant while the bartender closed out the cash register. A waitress at the restaurant waited for the bartender so that they could lock the door and walk together to their cars. The waitress saw defendant pass by her while the accomplice was sitting to her right. She then heard a "pop" and lost consciousness. When she regained consciousness, she was bleeding from the back of her head, where a bullet had entered her head without piercing her skull. She found the bartender lying dead in a pool of blood behind the bar and called the police.
Based on the waitress's statement, the police obtained arrest warrants for defendant and his accomplice. They first arrested the accomplice, who initially gave a statement denying any knowledge of the shooting. Two hours later, however, he gave another statement, acknowledging that he was present when defendant shot the two women. He consented to a search of his apartment which produced $85, approximately half of the amount of money taken from the restaurant, and three .25 caliber bullets. The accomplice admitted that the money was his, but said he did not know anything about the bullets.
The police then arrested defendant, who initially denied knowledge of the shooting. However, when the police informed him that the waitress had survived, defendant gave a second statement in which he confessed to shooting both women, claiming that the bartender had threatened him after she thought he had tried to touch her. He subsequently showed the police where he had hidden the money bag and where he had thrown the gun, a stolen .25 caliber automatic pistol registered to his brother.
At defendant's trial,[2] expert testimony linked the gun to the shootings and showed that both victims were shot in the head at very close range. Defendant testified, claiming that his accomplice shot the women and took the bank bag. Defendant stated that he disposed of the gun and the bank bag because his accomplice threatened him. He further claimed that the police put him in a room with his accomplice, who threatened him and told him that he should take responsibility, whereupon he told the police that he had done the shooting.
The jury found defendant guilty as charged of first degree murder. After a one-day penalty phase trial, the jury recommended a sentence of death, finding as aggravating circumstances that (1) defendant was engaged in an armed robbery; (2) defendant knowingly created a risk of death or great bodily harm to more than one person; and (3) defendant had been previously convicted of an unrelated aggravated burglary. Defendant appealed his conviction and sentence to this court.

Denial of Defendant's Challenge for Cause
Defendant claims that the trial court wrongly denied his cause challenge to juror Ingraham after the juror stated he would be inclined to recommend a life sentence after conviction of first degree murder only if defendant managed to produce "heavy" evidence of mitigation.
When the prosecutor asked Ingraham if he could consider a life sentence, he answered, "If we found guilty of first degree murder, I would start at death and then go towards life if the evidence was presented towards it." The prosecutor then explained mitigating circumstances and stated that jurors must consider them, *849 whereupon Ingraham stated, "I could weigh the evidence, but it would have to be very significant and I know I would start in my mind if it was first degree, in my mind I know it would start at death and then onit would have to be some pretty heavy evidence for me to sway towards life."
Later, when questioned by the defense about whether he could consider both aggravating and mitigating circumstances, Ingraham stated, "Yes, I'm able to consider both." Ingraham then referred to a statement made during the questioning of the previous panel that the aggravating and mitigating circumstances "didn't have to all carry the same weight," and defense counsel agreed. Ingraham then commented, "I'm saying the mitigating circumstances would have to really impress me to switch from leaning toward the death penalty, assuming a first degree murder verdict of guilty is rendered." When defense counsel indicated that each juror would have to determine the weight to be given to the mitigating factors, Ingraham stated, "I'm saying I would place very little weight. You would really have to impress me with these other circumstances. But I could consider them with an open mind." Defense counsel then replied, "That's great," and went on to the next prospective juror.
At the completion of the examination of the panel of eighteen prospective jurors, defense counsel challenged Ingraham for cause, and the judge denied the challenge. The judge interpreted Ingraham's responses as indicating he would start with the death penalty and at least one aggravating circumstance, and would then work back and consider mitigating factors. Defense counsel accepted Ingraham "under pressure and duress,"[3] and he became the ninth juror seated on the panel.
A prospective juror may be excluded for cause if his or her views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."[4]Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (clarifying Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)); La.Code Crim. Proc. art. 797(2). A juror must be able to "consider a life sentence ... under the factual circumstances of the case before him...." State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1284. If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duty to consider mitigating circumstances and other evidence in the penalty phase, the defendant's challenge for cause should be granted. Id. 630 So.2d at 1283; cf. also State v. Ross, 623 So.2d 643, 644 (La.1993) (juror disqualified who would vote for death in any case of first degree murder).
The Supreme Court has explicitly noted that a juror's substantial impairment "does not have to be proved with `unmistakable clarity,'" stating:
This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many venireman simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; ... Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the *850 definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.
Witt, 469 U.S. at 424, 105 S.Ct. 844. Accordingly, a trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, pp. 6-7 (La.6/30/95), 658 So.2d 683, 686-687; Robertson, 630 So.2d at 1281.
A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has voiced an opinion seemingly prejudicial to the defense, if the juror, on further inquiry or instruction, demonstrates a willingness and ability to decide the case impartially according to the law and evidence. Robertson, 630 So.2d at 1281; Cross, 658 So.2d at 686-88. A prospective juror who indicates his personal preference for the death penalty as the punishment for first degree murder, but who also states "in his own words, that he would not automatically vote for the death penalty, and that he could put aside his personal opinions and consider either penalty" need not be stricken for cause. State v. Hart, 96-0697, p. 10 (La.3/7/97), 691 So.2d 651, 658.
A defendant does not begin the penalty phase of a capital case clothed in a presumption that life imprisonment is the appropriate sentence. State v. Langley, 95-1489 (La.4/14/98), 711 So.2d 651, 667. Likewise, the state does not begin with a presumption that death is the proper punishment. By deliberate choice, Louisiana does not provide any standard for a juror to weigh mitigating circumstances against aggravating circumstances.[5]State v. Strickland, 94-0025, pp. 48-49 (La.11/1/96), 683 So.2d 218, 238. Nevertheless, the Louisiana death penalty scheme does require that a juror consider any mitigating circumstances before deciding whether to recommend a sentence of death. La.Code Crim. Proc. art. 905.3. Moreover, the judge must instruct the jury "concerning all of the statutory mitigating circumstance," La.Code Crim. Proc. art. 905.3, "because the mitigating circumstances are certainly part of the `law applicable to the case. See C.Cr.P. Art. 802(1).'" La.Code Crim. Proc. art. 905.3, 1985 Comments, cmt. (a).
In this case, Ingraham stated that he could put aside his predisposition in favor of the death penalty and consider recommending a life sentence, but conditioned any inclination to recommend a life sentence on the requirement that the defense present "some pretty heavy evidence" in mitigation. The issue thus becomes whether this juror, who would consider mitigating evidence but would require substantial evidence in mitigation in order to be inclined to recommend a life sentence, is substantially impaired in his performance as a juror.
There is no statutory or legal presumption in favor of any penalty or any mitigating circumstance, and individual jurors often, if not always, have their own inchoate or unarticulated predispositions. Such personal predispositions do not offend the law, provided that they do not "substantially impair" the juror's duty to follow the law.[6] Not every predisposition or leaning in any direction rises to the level of substantial impairment. Significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role. *851 See Witt, 469 U.S. at 424, 105 S.Ct. 844. When the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause. While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification.
In the present case, defense counsel and Ingraham, in their colloquy on mitigating circumstances, agreed that each juror was to determine the weight or degree of importance to be given to mitigating circumstances. Ingraham then stated, in effect, that he would consider mitigating circumstances, but would assign little weight or importance to any mitigating circumstances that he did not consider significant in light of the fact that defendant had been proved guilty of first degree murder. Ingraham did not reject consideration of any specific mitigating circumstance, but simply suggested that only serious mitigating circumstances would incline him to a life sentence recommendation after a guilty verdict.
The trial judge perceived Ingraham's responses to mean that his predisposition toward the death penalty, balanced with a willingness to consider mitigating circumstances and to credit those that he deemed "pretty heavy," did not significantly impair Ingraham's performance of his duties as a juror in accordance with his instructions and his oath. On this record of the voir dire, taken as a whole, we cannot say the trial judge abused his discretion in making that determination.

Discharge of Seven-Member Voir Dire Panel
Defendant argues that the trial court erred by granting the prosecutor's motion to discharge an entire seven-member jury panel because a prospective juror, Melito, criticized the striking of several African-American women.
While the prosecutor was asking questions during voir dire, Melito told the prosecutor she was "very upset" over the earlier striking of black women, an act she considered racist and "horrendous." The exchange occurred as follows:
DA: Ms. Melito, the question is, if we presented sufficient evidence, ma'am, could you vote to impose the death penalty?
Melito: I could consider it.
DA: Could you vote to impose the death penalty?
Melito: I don't know. I don't have no evidence against anyone. This man is innocent.
DA: Ma'am, I'm not trying to upset you.
Melito: I am upset about this whole situation. I mean what happened earlier is terrible. I mean what y'all did before was so horrendous to me.
DA: What did we do to you?
Melito: Not to me.
DA: What did we do that's upset you?
Melito: You hit every black woman on the panel. You did, didn't you?
DA: I don't know what you're talking about.
Melito: I do. I think everybody else knows that as well. And I am very upset about it, and I don't believe in death. And I don't think that you should, you know, kill another person just because that person killed a person.
DA: Okay.
Melito: It makes us guilty of the same thing.
Later, Melito interjected herself into an exchange between the prosecutor and another prospective juror about the credibility of police testimony. Melito questioned whether the prosecutor believed everyone *852 lied and no one was honest, but the prosecutor avoided a confrontation. The attorneys then proceeded to question other jurors. During a bench conference involving another juror, the prosecutor moved to excuse Melito for cause, although defense counsel had not yet questioned her. The prosecutor pointed to her obvious prejudice against the state and to the probability that the panel had already been infected by her remarks. The judge declined to excuse Melito at the time, but expressed his fear that the entire panel may have to be dismissed "after she gets through."
After further questioning of other panelists, the prosecutor again addressed Melito, as follows:
DA: Ms. Melito, the comment that you made earlier, you want to take the microphone, the comment you made earlier about everyone could see what had been done about the black women being excluded
Melito: I said that I could see that.
DA: You said it was obvious to everyone else.
Melito: To me it was.
DA: No, ma'am, you said it was obvious to everyone else in the jury; those were your words.
Melito: Yes.
DA: What I would like to know now is, what is it that made you think that the State cut those black women? What is it that made you think we cut them?
Melito: I don't think that. I didn't say that.
DA: What do you think?
Melito: I didn't think that was fair.
DA: What was fair?
Melito: Racism.
DA: Okay, and what was it that made you think that anyone in this courtroom had anything to do with racism today?
Melito: Because of some questions that were asked earlier.
DA: And exactly what questions were those?
Melito: You know, just about how we felt about race and things like that and, you know a soul has no color.... That's how I feel.
DA:the Judge could tell you this but the Supreme Court requires that those questions be asked. That if those questions were not asked in a crime like this, the whole case could be reversed, if there were a conviction.
Melito: I didn't know that.
DA: I'm telling you now.
Melito: Thank you. I appreciate that.
DA: So do you still have any questions about whether there was racism in this courtroom today; and if so, I would like you to tell me why.
Melito: I just did.
DA: Okay, are there any other reasons?
Melito: I believe that
At this point, defense counsel requested that further questioning of the witness be conducted outside the jury's hearing, but the judge simply ordered the attorneys to move on to other issues.
Shortly thereafter, another prospective juror, Summers, raised again the issue of the conducting of voir dire. In trying to explain Melito's distress, Summer expressed concerns over what he perceived to be attempts to "change the minds" of the panelists, as follows:
Summers: I don't know if you wish to hear this, but to get back to what the young lady on the other end was saying, I don't think she articulated what she was really trying to say.
At the end of the last panel, it was observed that you tookthe Court took all five black women who had voiced their opinion when they were questioned that they were against the death penalty, they would not impose it, and it appeared that y'all were trying to change their mind, to get them to change their mind so they would be accepted. It appearsof course you want equal representation of a minority *853 on your jury, which is fine. But I think that was very obvious that was what was happening ... [Y]ou get them up there and try to change their mind. I don't think that's fair.
DA: Try to change their minds to do what, sir?
Summers: I'm just saying it appeared that you took five
DA: When you say you, you're talking to me?
Summers: Whoever was up there, you know, you were all up there. But all five of the black woman said they were againstthey would not impose this, and you brought all five of those up there and questioned them again. I don't thinkit appeared that you were tryingthe Court was trying to change their mind so you could get representation of more blacks on the jury. That's the way it appeared. That's what I think she was trying to say.
Summers thus seemed troubled by the counter-intuitive voir dire process in capital cases whereby each party seeks jurors who are sympathetic while portraying them as not so sympathetic as to be disqualifiable.[7]
The prosecution moved to strike the panel on the basis that the jurors believed the prosecutor had done something wrong in terms of race relations. The trial court deferred its ruling after defense counsel asked for an opportunity to clear up any confusion by explaining the voir dire process to the jurors. After further voir dire,[8] however, the prosecutor reurged his motion, and the court dismissed the entire panel.
Defendant argues that the trial court, by striking the entire panel for cause, essentially gave the prosecutor extra peremptory challenges in violation of La.Code Crim. Proc. art 800 B.[9] Defendant also contends the trial judge should have allowed further questioning of each remaining panelist to determine the effect of the exchange between Melito and the prosecutor.
Whether or not to strike a single juror or an entire panel is committed to the discretion of the trial judge. United States v. Khoury, 901 F.2d 948, 955 (11th Cir.1990). A review of jurisprudence from various jurisdictions reveals that striking an entire jury panel occurs rarely and is usually sought by a criminal defendant.[10] *854 The Supreme Court of Missouri has observed, "Normally, the disqualification of an individual juror for the expression of an opinion, or for making remarks indicating bias, is not a sufficient ground for the challenge of the entire panel." State v. Williams, 630 S.W.2d 117, 119 (Mo.App. 1981) (quoting State v. Weidlich, 269 S.W.2d 69 (Mo.1954) and citing other cases). On the other hand, the court in Callaway v. State, 208 Ga.App. 508, 431 S.E.2d 143, 145-46 (1993), noted that sufficiently prejudicial remarks could mandate dismissal of entire panel.
In a case recently before this court, State v. Connolly, 96-1680, pp. 7-9 (La.7/1/97), 700 So.2d 810, 816-17, a prospective juror said she had heard that the defendant had molested children other than the one he murdered. The judge dismissed that panelist for cause, but denied the defendant's challenge for cause of the rest of the panel after asking each remaining panelist individually whether the remarks caused him or her to form a fixed opinion. Defendant argues that the trial judge in this case should have done as the judge did in Connolly.
In the present case, six of the seven members of the panel were questioned to some degree after the comments of Melito and Summers. The judge did not curtail examination, insofar as this record shows, and there was no objection in this regard. Further examination by the judge specifically addressed to the effect of the comments may have been desirable, but there was no request on the record for such questioning, and the judge apparently perceived, from early in the questioning, that Melito's belligerent attitude toward the death penalty and the prosecutor adversely affected the entire panel.
The common and most significant thread running through the jurisprudence in this area of the law is that an appellate court must give due deference to the trial judge who has seen and heard the jurors and has determined whether a remark has prejudiced or tainted the panel. See, e.g., State v. Browner, 587 S.W.2d 948, 951-52 (Mo. Ct.App.1979) (noting that an appellate court "must recognize the fact that the trial court is in a better position to observe what effect, if any, the juror's allegedly prejudicial statement had on his or her fellow jurors"); State v. Gash, 572 S.W.2d 240, 241-42 (Mo.Ct.App.1978) (emphasizing that the trial judge is in best position to evaluate the effects of a juror's remarks); State v. Murphy, 533 S.W.2d 716, 717-18 (Mo.Ct.App.1976) ("The trial court, having heard both the venireman's words and his tone of voice, was the best judge of *855 any possible prejudicial impact on the jury.").
In the present case, both Melito and Summers expressed concern over the integrity of the voir dire process itself. Each attributed the previous dismissal of five black females to some wrongdoing on the part of the attorneys, especially the prosecutors. The prospective jurors had observed the earlier proceedings and heard Melito's interpretation of the events. They also heard Summers' impression that the attorneys were trying to change the minds of the prospective jurors in order to obtain minority representation on the jury. Even defense counsel, who asked for (and was afforded) an opportunity to "clear it up" for the jurors, conceded that the situation was "unusual" and that there appeared to be an air of confusion among the jurors. The transcript as a whole suggests certain elements of confusion, disarray and hostility after Melito's comments.
Nonetheless, we do not read between the lines of the transcript either to agree or disagree with the trial judge's rulings, because that is beyond the scope of appellate review. Rather, we defer to the trial judge's decision, in the absence of clear evidence that he abused his discretion in the conduct of the voir dire so as to deprive defendant of a fair trial. Given the trial judge's broad discretion and the fact that he observed the demeanor of the entire panel during the remarks by Melito and Summers, we conclude that the trial judge did not abuse that discretion by dismissing the entire panel.[11]

Admissibility of Defendant's Confession
Defendant argues that the trial court erred by admitting his confession. Defendant first argues that he did not knowingly, intelligently, and voluntarily waive his right against self-incrimination.
Before a confession may be admitted into evidence, the prosecutor has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. La.Rev.Stat. 15:451; State v. West, 408 So.2d 1302 (La.1982); State v. Dewey, 408 So.2d 1255 (La.1982). Furthermore, if the statement was made during custodial interrogation, the prosecutor must show that the defendant was advised of his or her constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; State v. Petterway, 403 So.2d 1157 (La.1981). The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of testimony relating to the voluntariness of a confession should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980).
In the present case, a police officer advised defendant of his constitutional rights at the station before he made his first statement, and defendant signed a waiver of rights form. The interrogating officer asked:
Q: Okay. Before we turned this tape recorder on I filled out a Rights Form with you, is that correct?
A: Right.
Q: Okay. Now are you agreeing to make a statement [to] tell us, you know, what happened at your place of employment last night to the best of your knowledge?
A: I have to right.
Q: No you don't have to. We're just asking you to tell us, you know, what happened at the time you got off?
A: Yeah.
Q: Are you willing to do that?
A: Yeah.
*856 The defense argues that the fact that the defendant said, "I have to[,] right[?]" shows that he did not understand his rights and therefore did not knowingly and intelligently waive them. The audiotape indicates that defendant's remark was a question. However, the tape also shows that the officer, in response to the question, explicitly told defendant that he did not have to talk to the police. Defendant then stated that he was willing to tell the police what happened and gave his first statement, which was exculpatory. He finished the first statement at approximately 6:30 p.m. After being told that one of the victims had survived, defendant gave a second statement (which was inculpatory) approximately twenty minutes later. Before starting any substantive questioning, the officer established on tape that defendant had seen, understood, and signed the waiver of rights form, and still wished to give the statement.
At the hearing on the motion to suppress, a police officer testified that he advised defendant of his constitutional rights, had him initial each one of the rights on the waiver of rights form as defendant read them, and then had him sign the waiver. The officer further testified that he did not promise defendant anything in exchange for the statement and did not threaten or coerce him. Another officer testified that he was present when the first officer advised defendant of his constitutional rights and had defendant sign the waiver of rights form. He also testified that defendant never indicated before the second statement that he wanted an attorney or that he did not want to answer any more questions.
Defendant testified at trial that he did not understand his right to remain silent and that he was threatened and "roughed up" before he gave his inculpatory statement. However, there is no evidence to support these claims, and the jury apparently disbelieved defendant's testimony and credited that of the police officers.
Defendant also argues that the involuntariness of the first statement carried over to the second statement because the police did not readvise him of his rights before his second statement. However, as noted, defendant knowingly, intelligently, and voluntarily waived his constitutional rights before his first statement. In addition, before defendant gave his second statement, an officer reminded defendant of his rights and asked him if he was still willing to speak with the police. Defendant again indicated that he understood his rights and wanted to give a statement.
The police were not required to obtain another waiver of rights from defendant before the second statement, which began only about twenty minutes after the first statement ended. See State v. Mitchell, 421 So.2d 851, 852, n. 6 (La. 1982) (the police had no need to readvise the defendant of his constitutional rights after a lapse of thirty minutes).
Finally, defendant argues that his confession was not admissible because a policeman spoke with him between his first and second statements and did not record the conversation. Defendant argues that because the police did not record the conversation during the period between the two statements, they violated statutory law that requires a statement to be produced in its entirety, thus making the part that was recorded inadmissible.[12]
In the present case, the two statements were played in their entirety, and nothing in the record except defendant's testimony suggested that defendant made other statements to the police which were not recorded. "The law does not require the production of non-existent portions of the confession or portions which cannot be recalled." *857 State v. Marmillion, 339 So.2d 788, 793 (La.1976). Moreover, one officer testified that he talked to defendant and told him that the police did not believe he was telling the truth, that his co-perpetrator had given a statement, and that one of the victims had survived, whereupon defendant gave the recorded statement. The officer also testified that he did not threaten or intimidate defendant verbally or physically.
We conclude that the playing to the jury of the two statements did not violate statutory law.

Admission of Accomplice's Statements
Defendant complains of the admission of a statement made to the police by his accomplice. Defendant argues that the accomplice's statement was inadmissible hearsay and that its use deprived defendant of his rights under the Fourteenth and Sixth Amendments, the Louisiana Constitution, and the special Louisiana statutory right to confrontation.[13]
The accomplice first told the police that both victims were at the store, alive and unharmed, when he and defendant left the restaurant together. However, in a later statement of which defendant now complains, the accomplice stated that he saw defendant with a gun, heard a gunshot, and saw the surviving victim fall to the ground. He then stated he saw defendant go behind the bar and shoot the murder victim.
The basis for the exclusion of an accomplice's statement, even one which is against the accomplice's penal interest, is the longstanding perception that custodial confessions of non-testifying, unavailable codefendants are inherently suspect and presumptively unreliable as evidence against the defendant. Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). Admission of parts of an accomplice's purportedly "interlocking" statement pertaining to a defendant's participation in the crime poses too serious a threat to the accuracy of the verdict to be countenanced by the Confrontation Clause, unless the parts are thoroughly substantiated by the defendant's own confession. Lee, 476 U.S. at 545, 106 S.Ct. 2056. But cf. Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (approving admissibility of a codefendant's statements when there is a "showing of particularized guarantees of trustworthiness"). Moreover, the hearsay exception for declarations against penal interest[14] "does not allow admission of non-self-inculpatory statements by accomplices, even if they are made within a broader narrative that is generally self-inculpatory." Williamson v. United States, 512 U.S. 594, 600-01, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). Accordingly, only the self-inculpatory parts of an accomplice's confession should be admitted.
In the present case, the accomplice's statement "interlocked" with defendant's own statements, but was not sufficiently self-inculpatory to be considered a statement against interest admissible against defendant under La.Code Evid. art 804 B(3). Moreover, the accomplice's statement did not fall within any other hearsay exceptions.
Nevertheless, the admission of the accomplice's statement was harmless beyond a reasonable doubt. In light of the other overwhelming evidence of guilt, including defendant's own confession, the murder weapon linked to defendant, and the surviving victim's testimony, the guilty verdict was surely unattributable to the error in *858 admitting the accomplice's statement. See State v. Wille, 559 So.2d 1321, 1332 (La. 1990) (admission of hearsay violated confrontation rule, but was harmless in light of other overwhelming evidence of guilt) (citing Delaware v. Van Arsdall, 475 U.S. 673, 682, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Moreover, the statement (which interlocked with defendant's own confession on every material point) did not introduce an arbitrary factor into the proceedings that would diminish the reliability of the jury's verdict in the penalty phase.[15]

The Prosecutor's Closing Remark
Defendant argues that the prosecutor committed reversible error when he implied that he had more evidence than he presented by stating, "Come back with guilty of first degree murder, and we'll give you more evidence."
During rebuttal argument in the guilt phase of trial, the prosecutor stated in pertinent part:
Based upon the totality of the evidence, we're asking you to find the Defendant guilty of first degree murder for two reasons; because he attempted to take the life of more than one person, and because it was during the course of an armed robbery. And don't be embarrassed. Don't be afraid to go back there and say the evidence was so overwhelming you'd come right back out and say guilty as charged. This is not the death penalty phase; this is only the guilt phase. Come back with guilty of first degree murder, and we'll give you more evidence. Thank you.
A prosecutor may not "indicate to the jury that he has additional evidence of the defendant's guilt which he did not present at trial." State v. Smith, 554 So.2d 676, 681 (La.1989) (citations omitted), overruled on other grounds by State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. In Smith, this court reversed a conviction and death sentence because the prosecutor "boldly represented outright to the jury that he had additional evidence of appellant's guilt that he simply saw no need to present to them," and told the jury that he could have put on more witnesses, but that it would have been a waste of time. Id. Cf. also State v. Harrison, 367 So.2d 1 (La.1979) (reversing convictions and sentences because the prosecutor referred to an alleged other crime and then explained that he was barred from admitting evidence of it).
In the present case, the prosecutor's statement was not a reference to additional evidence applicable to the guilt phase of trial. The comments were a reminder by the prosecutor that he asked the jury only to determine defendant's guilt or innocence at that point, and that he would present additional evidence in the penalty phase before he asked them to vote for the death penalty. Even if the remarks could be construed as improper, this court is not "thoroughly convinced that the remarks influenced the jury and contributed to the verdict." Taylor, 93-2201, p. 19, 669 So.2d at 375. Given the evidence presented at trial supporting defendant's guilt, the brief comment made by the prosecutor did not influence the jury or contribute to the verdict.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. R. 28, this court reviews every sentence of death to determine if it is constitutionally excessive. In making this determination, the court considers *859 whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to statutory aggravating circumstances; and whether the sentence is disproportionate, considering both the offense and the offender.
The Uniform Capital Sentence Report and the Capital Sentence Investigation Report indicate that defendant is a black male born on May 25, 1975. He completed eighth grade, and testing revealed an I.Q. in the low range, below seventy. According to defense expert psychologist, defendant can read at a high school level, spell at a sixth grade level, and do arithmetic at the fifth grade level.
Defendant is the second oldest of four children. According to his older brother, their mother was verbally and physically abusive to defendant when he was growing up. Defendant's aunt testified that she never observed physical abuse, but defendant's mother cursed at the children and called them names.
The investigators for the Capital Sentence Investigation made several attempts to speak with defendant's family about his social history, but the family failed to respond, and defendant was similarly uncooperative.
Defendant has never been married, but has fathered one child who was four years old. It is not known whether defendant was contributing to the support of the child at the time of the offense.
Defendant has worked as an associate producer of the Tremé Festival, at the Olympic trials, as a maintenance person at City Park, and as a bus-boy, although no information was provided as to the length of employment for those positions or the reasons for termination.
A psychiatric evaluation revealed that defendant was able to distinguish right from wrong and able to adhere to right, and was capable of cooperating in his defense.
Defendant has two prior convictions as an adult, one for attempted second degree murder and one for aggravated burglary, both arising from events which occurred in December 1992. He was on probation and had been out of prison only a few months at the time he committed the present offense. Defendant has two juvenile adjudications, one in 1990 for theft, and one in 1991 for attempted simple burglary.[16]

1. Passion, Prejudice, and Other Arbitrary Factors

Defendant contends that arbitrary factors were injected into the proceedings in several respects. Specifically he notes that he was prejudiced by the exclusion of prospective jurors based on their religious scruples. He also reiterates his claims that he was prejudiced by the prosecutor's decision to pursue the death penalty solely on racial grounds, the failure of the court to note the racial composition of the jury pool and the racial composition of the jury, and the dismissal of an entire jury panel after statements were made about the exclusion of black females by two prospective jurors in the presence of the others on the panel. All of these arguments are addressed in depth above or in the unpublished appendix, and do not present meritorious grounds for reversal.

2. Aggravating Circumstances

At trial, the jury found three aggravating circumstances: (1) defendant was engaged in the perpetration of an armed robbery; (2) defendant knowingly created a risk of death or great bodily harm to more than one person; and (3) defendant has been previously convicted of an unrelated *860 aggravated burglary. The evidence was sufficient to support the jury's finding of all of these aggravating circumstances. The surviving waitress's testimony established that defendant was armed with a gun and shot her. Defendant confessed to shooting both the waitress and the bartender in the head and taking the bank bag from the restaurant. Defendant stated in his confession that he shot the waitress so that she would not be a witness. The prosecutor also introduced the money bag taken from the restaurant and retrieved from the place defendant stated he had disposed of it.
The evidence thus established that both victims were shot during the commission of an armed robbery and that defendant had specifically intended to kill each victim, though only one died. Finally, the prosecution introduced a certified copy of defendant's conviction for unrelated aggravated burglary.

3. Proportionality Review

Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1 (La.1979).
The Sentence Review Memorandum reveals that jurors in the 24th Judicial District since 1976 have returned a guilty verdict for a first degree murder charge in sixty-two cases and recommended imposition of the death penalty sixteen times. Seven of the sixteen cases in which the jury returned a death sentence, including the present case, involved armed robbery as an aggravating factor. A review of these cases shows that the death penalty imposed in this case is not disproportionate.[17]
On a statewide basis of review, this court has affirmed many capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery. See, e.g., State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (affirming the death penalty for a single-shot armed robbery-murder when the jury also found another aggravating circumstance that the defendant had caused risk of great bodily harm to another victim); State v. Thompson, 516 So.2d 349, 356-57 (La.1987) (affirming the death penalty for a single-shot armed robbery-murder while questioning the finding of another aggravating circumstance). Moreover, the jury in the instant case found the additional factors that the defendant knowing created a risk of death or great bodily harm to more than one person, and that he has a significant prior history of criminal activity. *861 Finally, although defendant at the time of the offense was only nineteen years old, this court has affirmed death verdicts for defendants as young as seventeen at the time of the offense. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Prejean, 379 So.2d 240 (La.1979). The comparison of defendant's case with similar cases indicates that the death penalty is not disproportionate, considering both the offender and the offense.

Decree
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La.Rev.Stat. 15:567, until either (a) defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari, and either (i) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.

ON REHEARING
CALOGERO, C.J., dissenting from the denial of the rehearing.
I would grant rehearing in this case to re-examine assignments of error number twenty-nine and number one, where the defendant complains that the trial court erred both in its dismissal of an entire panel of jurors because of comments made by one member of that panel in the presence of the entire panel and in its failure to dismiss Juror Ingraham for cause.
I am of the opinion that the dismissal of an entire jury panel, including seven qualified and nearly selected jurors because one of them has purportedly infected the others with strident, critical comments concerning the State's strike of several African-American women is much too offensive to the due process rights of the defendant.[1]
I also believe, regarding the trial court's failure to dismiss Juror Ingraham for cause, that a prospective juror who would begin the sentencing phase of a capital case with the presumption that death is the appropriate sentence unless the defendant presents "some pretty heavy evidence" in mitigation, is no more qualified to sit on the jury than a prospective juror who would begin a penalty phase with a presumption that life is the appropriate penalty, but who would consider the death penalty, "[i]f that's what they deserve." State v. Williams, 96-1023, p. 10 (La. 1/21/98), 708 So.2d 703, 713. An evenhanded application of the law requires no less.
By deliberate choice, the Legislature did not provide any presumptions or fixed standards for a capital sentencing jury to use in considering aggravating and mitigating evidence. State v. Sonnier, 402 So.2d 650, 657 (La.1981). It was intended that a qualified juror not enter the penalty phase of the trial with a presumption that death is the appropriate penalty, which presumption the defendant would necessarily bear the burden of overcoming. Thus, any juror who would begin the penalty phase with a presumption of death, unless "heavy" evidence in mitigation was presented, is unfit to serve on a capital jury, just as would be a juror who would begin the penalty phase of the trial with a presumption that life is the appropriate penalty.
NOTES
[*] Johnson, J., not on panel. Rule IV, Part 2, § 3.
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is a part of the official record.
[2] The state severed the trials and prosecuted defendant and his accomplice separately. The jury in the accomplice's trial found him guilty of one count of second degree murder and one count of attempted second degree murder. This court ultimately denied certiorari. State v. Kelly, 97-3104 (La.4/9/98), 717 So.2d 1142.
[3] Defense counsel initially indicated he would use a peremptory challenges to remove Ingraham, but he changed his mind when he learned that he had only two peremptory challenges remaining and looked at "what's coming down the pike at me."
[4] Although the present case presents a reverse-Witherspoon situation, the Witt decision makes it clear that this standard applied to the exclusion of a juror requested by either the prosecutor or the defense. Morgan v. Illinois, 504 U.S. 719, 724, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
[5] This court has observed that "[t]he lack of a standard actually gives defendants an advantage by allowing jurors to consider any amount of mitigating evidence in their determination." Strickland, 683 So.2d at 238.
[6] Between the extremes of jurors subject to cause challenges for substantial impairment either for or against the death penalty lies the broad area where the prosecutor and defense counsel use their peremptory challenges to unseat jurors that they believe are predisposed against them.
[7] Typically, for example, defense counsel seeks to qualify "pro-life" jurors by eliciting concessions that they will be able to consider imposing the death penalty despite contrary leanings. Likewise, the prosecutor attempts to elicit testimony from "pro-death" jurors that they will consider imposing a life sentence despite their contrary leanings.
[8] During that additional voir dire, Melito expressed her concern that other jurors stated they had "no problem" with imposing the death penalty.
[9] La.Code Crim.Proc. art. 800B provides:

The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
Article 800B, however, must be read in light of Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987).
[10] See, e.g., Khoury, supra (when a venire person said her son was involved with drugs and murdered, and she began to cry, the judge struck her for cause, but denied the defendant's cause challenge to the entire panel, and instructed the jurors to ignore the remarks which he said were not evidence); United States v. Tegzes, 715 F.2d 505 (11th Cir.1983) (similar); State v. Kohler, 434 So.2d 1110, 1119-20 (La.App. 1 Cir.1983) (when a panelist expressed strong approval of public floggings, executions, euthanasia and mandatory imposition of death sentences for murderers, the judge struck the individual on defense counsel's motion, but denied a motion to strike the panel and instructed the jury to ignore the panelist's opinions); State v. Baker, 528 So.2d 776, 779 (La.App. 3d Cir. 1988) (when a panelist expressed a preconceived opinion of the defendant's guilt, the judge denied the defendant's motion to strike the entire panel, admonished the remaining panelists to ignore the remarks, and asked whether the remaining panelists would be influenced by the remarks); State v. McPherson, 93-0839 (La.App. 4th Cir.12/30/93), 630 So.2d 935, 941-42 (when two venire women made comments reflecting bias against the defendant, the admonition requested by the defendant was sufficient, and the trial court did not abuse its discretion by denying a mistrial); State v. Williams, 630 S.W.2d 117, 119 (Mo.App.1981) (when two venire persons expressed revulsion about the crime and bias against the defendant, the trial court denied defense counsel's motion to strike the panel and admonished the remaining panelists to disregard the remarks); State v. Browner, 587 S.W.2d 948, 951-52 (Mo.Ct.App.1979) (when a venire person said she had previously voted in error to free a guilty man and very much regretted it, the judge denied motions for mistrial and to strike entire panel); State v. Gash, 572 S.W.2d 240, 241-42 (Mo.Ct.App. 1978)(when a venire person said she recalled seeing the defendant at a state correctional training center where she had worked, the trial court granted the prosecutor's motion to strike the juror, but denied defense counsel's motion for mistrial); State v. Murphy, 533 S.W.2d 716, 717-18 (Mo.Ct.App.1976) (when a venire person asked to be excused because he had "seen defendant around" and did not think he could be fair, the trial court denied the defendant's motion to strike the panel); Callaway v. State, 208 Ga.App. 508, 431 S.E.2d 143, 145-46 (1993) (when a venire person said he would have trouble deciding fairly because he had worked with the defendant for fifteen years, the judge denied a mistrial, but admonished the jury and asked whether anyone could not be impartial after hearing the remarks); Lingerfelt v. State, 147 Ga.App. 371, 249 S.E.2d 100(1978)(the defendant should have been granted new venire, when a venire person's remarks "branded the accused as a sex deviate"); Roberts v. State, 259 Ga. 441, 383 S.E.2d 872 (1989) (the judge denied the defendant's motion to strike the panel where one venire person said killers "should go to the [electric] chair").
[11] In addition, it would be unfair to presume in this case that the dismissal of the panel inured to the benefit of the prosecutor. Indeed, defense counsel complained early in the voir dire of this panel that the panel was tainted by publicity about the case and recommended either a wholesale dismissal of the panel or a change in venue.
[12] La.Rev.Stat. 15:450 provides that "every confession, admission, or declaration sought to be used against anyone must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford."
[13] La.Rev.Stat. 15:273 provides:

The accused shall have the right to be confronted with the witnesses against him and the depositions of witnesses shall not be evidence either for or against him except as provided by law.
[14] La.Code Evid. art. 804B(3); Fed R. Ev. 804(b)(3).
[15] Defense counsel did not object to the taped statements and readily agreed to play them for the jury. Therefore, the claims are not reviewable for guilt phase error. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364. Defendant argues, however, that lack of a contemporaneous objection does not bar review of an error that affects the penalty phase. while this court has consistently applied Taylor to all unobjected-to guilt phase errors, whether or not they may have an impact on the sentencing hearing, see State v. Cousan, 94-2503, pp. 4-5 n. 1, (La.11/25/96), 684 So.2d 382, 386 n. 1, we nevertheless choose to discuss this error for purposes of future collateral review.
[16] In addition, while incarcerated for the present offense, the defendant was charged with five counts of battery on a police officer, two counts of introduction of contraband into jail, five counts of conspiracy to commit aggravated kidnaping, and one count of conspiracy to commit simple escape. All of the charges were subsequently dismissed.
[17] Benjamin Berry fatally shot a law enforcement officer during a bank robbery and was put to death in 1987. State v. Berry, 391 So.2d 406 (La.1980). Tyronne Lindsey killed a shopper in a mall parking lot. After numerous re-sentencings and a retrial, Lindsey is once again sentenced to death. State v. Lindsey, 543 So.2d 886 (La.1989). Jimmy Robinson killed the husband of an apartment complex manager in her presence during an armed robbery. This court vacated the death sentence, and Robinson received a life sentence in the second trial. State v. Robinson, 421 So.2d 229 (La.1982). Johnny Taylor stabbed to death a man whom he lured to a shopping center parking lot on the pretext of wanting to buy a car. State v. Taylor, 422 So.2d 109 (La.1982). Glen Seals fatally shot a cab driver and stole his cab. State v. Seals, 95-0305 (La.11/25/96); 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997). Elzie Ball shot and killed a deliveryman who attempted to stop the armed robbery of a bar; no appeal has yet been filed in this court.
[1] Among the seven challenged jurors was an African-American woman who could consider the death penalty and so could have served on the jury.