857 So.2d 1153 (2003)
STATE of Louisiana
v.
Bobby C. TERRICK.
No. 2003-KA-515.
Court of Appeal of Louisiana, Fifth Circuit.
September 30, 2003.
*1154 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, Donald A. Rowan, Jr., Cameron M. Mary, Assistant District Attorneys, Gretna, LA, for State.
Jane L. Beebe, Gretna, LA, for appellant.
Panel composed of Judges MARION F. EDWARDS, CLARENCE E. McMANUS and WALTER J. ROTHSCHILD.
*1155 CLARENCE E. McMANUS, JUDGE.
Defendant, Bobby C. Terrick, appeals his conviction and sentence for the second degree murder of Edward Sanchez. Defendant contends that the evidence presented by the state at trial was legally insufficient to support his conviction. Terrick also argues that the trial court committed reversible error in denying his motion to suppress the statement he gave the police and in denying his motion for a new trial. For the reasons stated herein, we affirm defendant's conviction and sentence but remand for the trial court to advise defendant of the appropriate delay to apply for post conviction relief.
The record shows that the Jefferson Parish Grand Jury returned an indictment charging defendant with the manslaughter of Edward Sanchez in violation of LSA-R.S. 14:31. Also indicted as a codefendant on this homicide was Jeremy Ross, who was charged with second degree murder. Ross and defendant were tried separately. Following his indictment defendant appeared and pled not guilty to the manslaughter charge. He then filed a motion to quash the indictment, alleging that his indictment as an adult was improper because he was a juvenile at the time of the charged offense. Defendant also filed a motion to suppress his identification as a perpetrator of the homicide and to suppress his statement to the police during questioning following the homicide. The suppression motion alleged that the identification and defendant's statement were obtained illegally. After separate hearings, the trial court denied both the motion to quash and the motion to suppress. The grand jury then re-indicted defendant and charged him with the second degree murder of Edward Sanchez in violation of LSA-R.S. 14:30.1. Defendant was re-arraigned on the charge and pled not guilty. The case proceeded to trial before a 12-person jury, which found defendant guilty as charged. Defendant then moved for a new trial and for post verdict judgment of acquittal. The trial court denied defendant's post trial motions and sentenced defendant to life imprisonment without benefit of parole, probation or suspension of sentence. Defendant timely appealed his conviction and sentence.
Three witnesses testified at trial, including the investigating officer, a fact witness, and the coroner. The investigating officer, Detective John Drury of the Jefferson Parish Sheriff's Office Homicide Division, testified that at approximately 5:00 a.m. on July 27, 2001, he received a report of a man shot in the head, located in the rear yard of 501 Wilker Neal Street in Kenner. Detective Drury responded to the call and found the victim, Edward Sanchez, still alive. The victim was taken to East Jefferson General Hospital where he subsequently died.
Dr. Susan Garcia of the Jefferson Parish Coroner's Office performed an autopsy on the victim. She testified that the victim died from a single gunshot to the head. In addition to the fatal wound, the autopsy revealed other injuries to the victim, including a bruised and swollen face and knuckles, lacerations of the head and abrasions of the chest. Toxicology tests run on the victim's blood and urine revealed the presence of cocaine and alcohol. A bullet jacket fragment was also recovered from the victim's body.
Detective Drury investigated the crime scene and had photographs of the area taken. The investigation revealed a footprint near the location where the victim's body was found and a blood trail running from the front of the residence to the rear. Testing disclosed that the blood matched the victim's. While searching the area around the residence, officers recovered a *1156 torn and bloodstained shirt, a bullet jacket fragment, and a dollar bill.
The investigation led Detective Drury to interview Rosemary Charles as a possible witness to the events surrounding this homicide. Ms. Charles gave police a statement about her observations on the night of the murder and then, based on a photographic line-up, identified defendant and Jeremy Ross as the men she saw assaulting the victim on that night.
Rosemary Charles was also called as a witness at trial. She testified that, on the evening of July 26, 2001, she went to a club in Kenner where she drank several beers. After she left the club, she walked to the house of a friend who lived on Wilker Neal Street, just off of Bengal Street in Kenner. From there, Ms. Charles walked to her brother's house, also located on Wilker Neal Street. According to Ms. Charles, it was approximately 3:00 or 4:00 a.m. on July 27, 2001 when Ms. Charles walked down Wilker Neal Street to her brother's house. In the 500 block of Wilker Neal, she saw three men engaged in an argument. The men were standing near a corner on Wilker Neal Street. Ms. Charles recognized two of the men as defendant and Jeremy Ross. She knew defendant and Ross from the neighborhood. According to Ms. Charles, the third man appeared to be either a light-skinned African-American or a Hispanic male. Ms. Charles testified that she walked past the three men on her way to her brother's house. She heard the third man, later identified as the victim, Edward Sanchez, say to defendant and Ross, "I'm 5-0, I got all now." She heard one of the other two men say "5-0 my a, I want my money." According to Ms. Charles, a physical encounter ensued and Sanchez was trying to take something from defendant and Ross. Ms. Charles continued walking to her brother's house, which was located four houses away from where the three men were located. As she approached her brother's residence, Ms. Charles looked back over her shoulder and she saw defendant and Ross kicking and punching Sanchez as he lay on the ground.
Ms. Charles entered her brother's residence and told him what she had just seen. Ms. Charles' brother cautioned her to stay inside his house. He also told her that he would walk her home to get some clothes so she could return and stay at his house while he went to work. Ms. Charles remained inside her brother's house approximately one-half hour. Thereafter, she and her brother left and walked down Wilker Neal Street. As the pair walked through the area where she had previously witnessed the three men, Ms. Charles could hear someone moaning from the rear of a blue house located on a corner of Wilker Neal Street. She saw the victim lying in the backyard of the house, and she thought he had been beaten. She did not realize the victim had been shot because she had not heard any gunshots. Ms. Charles' brother told her that this incident was none of her business, and the pair continued walking to Ms. Charles' residence. Thereafter, escorted by her brother, Ms. Charles returned to her brother's house where she remained until the next day.
Based on information Ms. Charles gave the police, along with the positive identification she provided during the photographic line-up, defendant and Jeremy Ross were arrested and booked for the murder of the victim. Ross declined to give police a statement, but defendant did give a statement to Detective Drury. In that statement, which was provided to the jury at trial, defendant admitted to punching the victim. He also admitted to chasing the victim to the rear of the house on Wilker Neal Street, along with Jeremy *1157 Ross. According to defendant's statement, while the men were in the rear yard, Jeremy Ross shot the victim with a .357 revolver.
On appeal, defendant challenges the legal sufficiency of the evidence against him. He claims that the state failed to prove that he was a principal to murder because the state did not establish that he had the specific intent to kill the victim or inflict great bodily harm on the victim. He contends that he did not shoot the victim nor did he know Jeremy Ross was going to shoot the victim. Additionally, defendant only admitted in his statement to being present during the shooting. The State responds that the evidence presented at trial was legally sufficient to support defendant's conviction of second degree murder.
When, as in this case, issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the appellate court first determines the sufficiency of the evidence. State v. Marcantel, 00-1629, p. 12 (La.4/3/02), 815 So.2d 50, 55, citing State v. Hearold, 603 So.2d 731, 734 (La.1992).
In reviewing the sufficiency of the evidence presented against defendant at trial, this Court must decide whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Mitchell, 99-3342, p. 9 (La.10/17/00), 772 So.2d 78, 82. We are not called to assess credibility of the witnesses or reweigh the evidence. State v. Marcantel, 815 So.2d at 56. The jury makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. Thus, an appellate court may impinge upon the jury's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." State v. Tate, 01-1685, p. 9 (La.5/20/03), 851 So.2d 921, State v. Ruffin, 02-798, p. 10 (La.App. 5 Cir. 12/30/02), 836 So.2d 625, 630.
To convict defendant of second degree murder in this case, the state was required to prove that he had the specific intent to kill or to inflict great bodily harm on the victim. LSA-R.S. 14:30.1(A)(1). Specific intent is "that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances of a transaction and from the actions of the accused. State v. Tate, supra; State v. Mitchell, supra. Additionally, specific intent to kill or inflict great bodily harm may be inferred from the extent of the victim's injuries. State v. Daniels, 01-545, p. 12 (La.App. 5 Cir. 11/27/01), 803 So.2d 157, 162.
Additionally, LSA-R.S. 14:24 establishes that, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime are principals." And persons who assist in the commission of a crime are guilty as principals, although they do not directly commit the act constituting the offense. State v. Lynch, 512 So.2d 1214, 1216 (La.App. 5 Cir.1987).
Nevertheless, the Louisiana Supreme Court recognized in State v. Wright, 01-322, p. 17 (La.12/4/02), 834 So.2d 974, 983, that more than mere presence and flight from a crime scene are required to find a defendant guilty as a principal. An individual *1158 may be convicted only for those crimes for which he personally has the requisite intent, and it is not enough that his accomplice had the intent. The State must prove the defendant had the requisite intent. State v. Tate, 01-1658, p. 12 (La.5/20/03), 851 So.2d 921.
The state's evidence against defendant at trial focused largely on the testimony of Rosemary Charles and on defendant's own statement to the police. Ms. Charles testified that she observed defendant and Jeremy Ross, both known to her from the neighborhood, as they argued with the victim over what she assumed was a drug deal. She saw the pair engage in a physical confrontation with the victim as he tried to take something from defendant and Ross. She looked over her shoulder at the three men when she reached her brother's house, only four doors away. Ms. Charles saw defendant and Ross brutally kicking and punching the victim as he lay on the ground. As she passed the scene a short time later with her brother, Ms. Charles heard moaning and saw the victim lying in the rear yard of the house where she had previously seen him. The autopsy findings, namely, that the victim also suffered injuries to his face, head, chest and hands, were consistent with the victim being violently kicked and punched, as described by Ms. Charles.
In his statement to police, defendant stated that the victim was engaged in a drug deal with Jeremy Ross, when the victim attempted to take the drugs without payment by telling defendant and Ross that he was a police officer. Defendant admitted that he initiated the attack on the victim by punching him. Thereafter, Ross joined in the attack on the victim. Defendant further admitted that he and Ross then chased the victim down and that he saw Ross produce a gun. Nonetheless, defendant continued to participate with Ross in chasing the victim. Defendant admitted in his statement that he was present and saw Ross shoot the victim with a .357 handgun. Following the shooting, defendant fled the scene.
The jury in this case could have reasonably inferred that defendant had the specific intent to inflict great bodily harm on the victim and was a willing participant in the offense which culminated in the victim's murder. Defendant initiated the brutal attack on the victim. He continued kicking and punching the victim even after the victim fell to the ground. When the victim attempted to flee, defendant pursued him. And even after seeing Ross armed with a handgun, defendant assisted Ross by chasing after the victim. Defendant did nothing to prevent the murder, nor did he render assistance to the victim following the shooting. Rather, he took flight from the scene after the shooting. The photographs of the victim introduced at trial demonstrate the extent of the victim's injuries and the brutality of the attack on him. Considering the trial testimony and evidence, the jury could have reasonably inferred that defendant specifically intended to inflict great bodily harm on the victim or even to kill the victim. We thus conclude that the evidence presented at trial was legally sufficient to support defendant's conviction of second degree murder and we reject defendant's claim that the evidence was insufficient.
Defendant next contends that the trial court's denial of the motion to suppress his statement to police constituted reversible error. He argues that the trial judge failed to consider the totality of the circumstances in finding that defendant gave the statement knowingly and voluntarily. The record discloses that the police arrested and questioned defendant believing that he was an adult, when, in reality, he was a juvenile. The birth certificate *1159 attached to the motion to quash filed in this case shows that defendant was 16-years-old at the time of his arrest. Nevertheless, all of the information possessed by the police at the time indicated that defendant was 17 years old when arrested. Defendant now claims that the trial court failed to consider his age and status as a juvenile in ruling on the suppression motion. The state responds that defendant's age alone does not bar the admissibility of his statement because, considering the totality of the circumstances, defendant's statement was knowing and voluntary.
Before introducing a defendant's statement into evidence, the state must show that the statement did not result from fear, duress, intimidation, menace, threats, inducements or promises. LSA-R.S. 15:451; State v. Lucky, 96-1687, p. 26 (La.4/13/99), 755 So.2d 845, 855, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). Moreover, at the hearing on a motion to suppress a statement, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the statement. LSA-C.Cr.P. art. 701.
The constitutional privilege against self-incrimination and the right to counsel apply equally to juveniles and adults. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); State in the Interest of D.J., 01-2149, p. 10 (La.5/14/02), 817 So.2d 26, 30. Thus, if the accused is in custody at the time of the statement, he must also have first been advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
The determination of whether a waiver of constitutional rights is knowing and voluntary is made on a case-by-case basis and such a determination rests upon the "totality of the circumstances." Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197, reh'g denied, 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979); State v. Fernandez, 96-2719, p. 7 (La.4/4/98), 712 So.2d 485, 487.
The defendant's age is one factor for consideration in determining whether an accused's statement or confession was knowing and voluntary. The Louisiana Supreme Court, in State v. Fernandez, 96-2719 at p. 7, 712 So.2d at 487 discussed age as one consideration in an evaluating the totality of the circumstances surrounding the rights waiver:
The confession of an accused of any age is valid only if it was given knowingly and voluntarily. The age of the accused, although an extremely important and extremely relevant factor in determining knowingness and voluntariness, is not absolutely determinative, and the rigid invalidation of an otherwise valid confession because the accused has not quite reached the age of seventeen has no federal or state constitutional basis.
The Louisiana Supreme Court has previously recognized that there are 16-year-olds whose knowledge of and ability to comprehend their legal rights surpass the knowledge and comprehension of many who are older. See, State v. Edwards, 406 So.2d 1331, 1340 (La.1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). Hence, in addition to age, some factors that have been considered in assessing the totality of the circumstances include the accused's experience, education, background, intelligence and capacity to understand the warning given at the time of the waiver. State v. Fernandez, 712 So.2d at 487, citing Fare v. Michael C. 442 U.S. at 725, 99 S.Ct. 2560. Moreover, the admissibility of a statement or confession is first a question for the trial court, and its conclusions on the credibility and weight of testimony relating *1160 to voluntariness of a statement will not be overturned on appeal unless not supported by the evidence. State v. Williams, 01-1650, p. 14 (La.11/01/02), 831 So.2d 835, 843. In reviewing the correctness of the trial court's ruling on the motion to suppress, the appellate court is not limited to evidence adduced at the hearing on the suppression motion, but may also consider pertinent evidence given at trial. State v. Wilson, 00-178, p. 3 (La. 12/8/00), 775 So.2d 1051, 1053; State v. Manson, 01-159, p. 6 (La.App. 5 Cir. 6/27/01), 791 So.2d 749, 755.
Detective John Drury was the sole witness to testify at the hearing on the motion to suppress defendant's statement. He testified that he took defendant's statement on July 31, 2001. According to Detective Drury, defendant was taken into custody just before the statement was given. At the time of the arrest, Detective Drury advised defendant that he was charged with murder and the officer verbally informed the defendant of his constitutional rights. Defendant indicated to Detective Drury that he wanted to tell his version of the facts. Defendant was then placed in a police car, instructed not to talk, and advised that an interview would be conducted once defendant arrived at the Sheriff's Department. Defendant was then driven to the Homicide Bureau where he arrived at approximately 10:35 p.m. on July 31, 2001. Detective Drury then read the defendant his constitutional rights, and the defendant executed a written waiver of rights that indicated he understood and sought to waive his constitutional rights. Detective Drury began taking defendant's taped statement at approximately 10:45 p.m. that evening. Detective Drury testified that he made no promises to the defendant nor did he coerce the defendant into giving the statement. He further testified that the taping continued uninterrupted and that, to his knowledge, defendant was interviewed only once. Detective Drury stated that defendant appeared upset during the statement and that defendant cried following the statement.
Detective Drury testified that defendant gave his date of birth as April 14, 1984, and never indicated or claimed that he was born in 1985. Additionally, Detective Drury also confirmed that the information for defendant's arrest warrant was taken from official police records and that those records showed 1984 as the year of defendant's birth. At trial, Detective Drury gave essentially the same testimony as he provided during the hearing on the suppression motion. Defense counsel presented him with a document introduced into evidence as a copy of defendant's birth certificate. The document indicated the date of defendant's birth as April 14, 1985. Detective Drury reiterated that all of the information possessed by the police at the time of defendant's arrest and questioning indicated that defendant was 17-years-old.
The record shows that Detective Drury twice informed defendant of his constitutional rights, including the right to remain silent. Defendant nonetheless indicated that he wanted to give a statement. No promises were made and no coercion was exerted to obtain the statement. Defendant, who was apparently upset by the circumstances in which he found himself, at no time sought to discontinue the statement. Even accepting that defendant was a juvenile at the time of the statement, this factor alone would not negate the voluntariness of his statement. He had a seventh-grade education and the circumstances do not indicate defendant was unable to understand the nature of his actions. Additionally, he was no stranger to the judicial system because the record indicates that he had a previous juvenile record. Considering defendant's life experiences, he may well have been the type of *1161 16-year-old described by the Louisiana Supreme Court in State v. Edwards, supra, as a person who was mature beyond his chronological age.
Based on our review, we find no error in the trial court's denial of defendant's motion to suppress his statement. Considering the totality of the circumstances, it appears the defendant's confession was freely and voluntarily given. Moreover, contrary to defendant's suggestion that the trial court failed to consider defendant's age in ruling on the motion, the transcript of the suppression hearing contains testimony concerning defendant's age at the time of his arrest and questioning. Defendant's error assignment challenging the denial of his suppression motion lacks merit.
Finally, defendant argues that the trial court committed error in denying his motion for new trial. The record shows that, following his conviction, defendant moved for a new trial, alleging as grounds that, under LSA-C.Cr.P art. 851(1), the guilty verdict was contrary to the law and evidence, and that, under LSA-C.Cr.P. art. 851(5), the ends of justice required a new trial in this case. The trial court denied the motion.
When, as in this case, a motion for new trial is grounded on an allegation under LSA-C.Cr.P. art. 851(1) that the evidence was insufficient to convict the defendant of the charged offense, the trial judge's decision to grant or deny the motion is not subject to appellate review. The trial judge, acting as a thirteenth juror, may consider only the weight and not the sufficiency of the evidence in such a motion. State v. Snyder, 98-1078, p. 81, n. 21 (La.4/14/99), 750 So.2d 832, 860; State v. Battie, 98-1296, p. 25 (La.App. 5 Cir. 5/19/99), 735 So.2d 844, 855, writ denied, 99-1785 (La.11/24/99), 750 So.2d 980.
Additionally, the Louisiana Supreme Court, in State v. Snyder, 750 So.2d at 860, at fn. 22, stated the following regarding a motion for new trial grounded on an allegation under LSA-C.Cr.P. art. 851(5) that the ends of justice required the grant of a new trial: "It is settled that a judgment on these grounds (invariably denying the motion) is unreviewable by an appellate court, which may review the grant or denial only `for error of law.'" This error assignment presents nothing for our review.
The record was reviewed for errors patent as required by LSA-C.Cr.P. art. 920. We note that, during sentencing, the trial judge failed to advise defendant of the prescriptive period for post-conviction relief, as required by LSA-C.Cr.P. art. 930.8, which provides that a court shall not consider an application for post-conviction relief filed more than two years after the judgment of the conviction and sentence has become final. Accordingly, we remand the matter with instructions to the district court to send the appropriate written notice to defendant regarding the prescriptive period for post-conviction relief and to file written proof in the record that defendant received the notice. State v. Jackson, 00-1014 (La.App. 5 Cir. 12/13/00), 778 So.2d 23, 33, writ denied, 01-162 (La.11/21/01), 802 So.2d 629.
AFFIRMED; REMANDED WITH INSTRUCTIONS.