983 So.2d 934 (2008)
STATE of Louisiana in the Interest of A.B.
No. 07-KA-907.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 2008.
*936 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Megan L. Gorman, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Katherine M. Franks, Attorney at Law, Abita Springs, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, CLARENCE E. McMANUS, and GREG G. GUIDRY.
CLARENCE E. McMANUS, Judge.
On March 23, 2007, A.B., a 14-year-old male juvenile, was charged by petition in juvenile court with an allegation of aggravated rape in violation of LSA-R.S. 14:42. On April 25, 2007, the juvenile's motion to suppress statement was denied. On that same date, the court determined that D.M., the 3-year-old female victim, was competent to be a witness. On May 23, 2007, after A.B. was adjudicated delinquent for aggravated rape by the court, he was sentenced to the Office of Youth Development until his 21st birthday without benefit of parole, probation, or suspension of sentence. The juvenile filed a notice of appeal that was granted.
The following facts were adduced at trial. K.M., D.M.'s mother, testified that, in February of 2007, she was giving D.M. a bath like she usually did, when D.M. said she did not want her mother to bathe her as she was having "pain below."[1] D.M. appeared to be scared and did not want to tell K.M. too much. Later that evening, in response to questioning, D.M. told her mother that she and K.B. (A.B.'s 10-year-old sister) had been watching pornographic movies, and that A.B. had touched her "below." K.M. explained that she had dropped D.M. off at A.B.'s and K.B.'s mother's house because she had to go to work. K.M. confronted A.B. over the phone, but he claimed he had no knowledge of the incident. K.M. and D.M. also went to see A.B.'s mother at her job and K.M. spoke to her about the situation. Afterwards, K.M. went to the police.
Erika Schwind, a forensic interviewer at the Jefferson Children's Advocacy Center, testified that she conducted a videotaped interview with D.M. on March 13, 2007. In that videotape, which was played for the court, D.M. said that A.B. was watching her at his house while her mother was at work. She stated that A.B. put his "weenie" in her mouth, and that she spit his "weenie" out. She also said that A.B. kissed her all over her body on her skin. She indicated that no one else was present when he did that, and that these incidents occurred in his room. After she was shown pictures of a boy and a girl, she made markings on them to show what parts of A.B. touched her.
Detective Kay Home of the Jefferson Parish Sheriff's Office (JPSO) testified that she and JPSO Detective Nick Vega went to A.B.'s home in River Ridge to pick up A.B. When they arrived, A.B.'s mother told them that A.B. was at work and not home. A.B.'s mother subsequently contacted somebody, and A.B. arrived a few minutes later. Detective Home explained to A.B.'s mother that they were investigating an allegation of aggravated rape, that this was a very serious offense, and that *937 A.B. was exposed to a penalty of juvenile life.
Detective Vega presented A.B.'s mother with the juvenile rights waiver form. A.B. and his mother were advised of A.B.'s rights, and they signed and initialed the form indicating they understood those rights. The detectives told A.B.'s mother that they were going to take him to the detective bureau across the river for further questioning. They offered to give A.B.'s mother a ride; however, she refused to go, stating that she was scared to go across the river. The detectives asked A.B.'s mother if they could take A.B. to the detective bureau for questioning, and she responded affirmatively. Afterwards, the detectives took A.B. to the detective bureau where he gave a statement.
In his statement dated March 19, 2007, A.B. indicated that approximately two weeks prior he was babysitting D.M. He explained that his older sister and D.M.'s mother were a couple. On the day in question, he found his younger sister (K.B.) and D.M. watching a "nasty" movie where people were having sex. A.B. said that D.M. explained to him that she and her 4 or 5-year-old brother "do it" all the time, and that she watched her mother "do it." A.B. stated that, the next day when he was asleep, D.M. woke him up and asked him if he wanted to "do it," and he told her "no, go sit down." D.M. kept "bugging" him, so A.B. "did it," and told her to go sit down. He later explained that D.M. sucked his penis.
Afterwards, D.M. left. A.B. testified that he did not hold D.M. down during the incident or force her to do what she did; he said that D.M. did this "on her own will."
A.B. called his older sister and told her what happened, and that she needed to talk to D.M.'s mother because D.M. had been seeing "what they were doing." His sister told him to "shut up," and that he did not know what he was talking about. A.B. then called D.M.'s mother who told him "it was not true." Approximately two or three days later, his older sister called and asked him for some "weed." When A.B. told her he did not have any, she threatened to call the police and said that he would go to jail.
A.B. denied putting his penis inside of D.M. He said that when D.M. was in the bedroom she started "humping" on the pillow, and that was how the situation started. A.B. also said that the same night that they were watching the movie, D.M. was "humping" his younger sister (K.B.). A.B. indicated that he did not want his mother involved in this matter. Afterwards, A.B. assured the detective that he was treated fairly, and that his statement was freely and voluntarily given.
After the State rested its case, the defense called A.B.'s mother as a witness. A.B.'s mother testified that Detective Horne told her on the day in question that they had to bring A.B. across the river for questioning, so she signed the rights form. A.B.'s mother told them that she could not go with them because she had nobody to watch her two children. A.B.'s mother also told the detectives that when Sherman Easley, K.B.'s father, arrived, she was going to meet the detectives at the bureau. She told them not to question A.B. until she got there, and that she was going to get a lawyer for A.B.A.B.'s mother did not think this was a serious matter at that time.
A.B.'s mother testified that, on the day of the incident, Easley came over and she left to go to work at approximately 8:30 a.m. She explained that the three children, A.B., K.B., and D.M., were in the house. When she returned home, she had no reason to believe anything unusual had occurred *938 as D.M. was playing like a typical child. A.B.'s mother testified that she later learned that K.B. and D.M. were watching pornographic videotapes that day that someone had found in her closet. When she asked A.B. about the rape allegation, A.B. denied touching D.M.D.M. also denied that A.B. had touched her when A.B.'s mother questioned her.
Sherman Easley testified that he was the father of K.B., and that he went to A.B.'s mother's house almost every day. He indicated that, on the day in question, he stayed in her house all day from the time that A.B.'s mother went to work until approximately 3:00 p.m. when A.B.'s sister came over. He said that the only time he left was when he went outside briefly to smoke a cigarette. Easley explained that, during the day, the children were in their room and he was in the front room watching television. He periodically checked on the children, but did not know that they were watching pornographic videotapes. He did not notice D.M. acting any differently. Easley testified that at no time that day was A.B. left alone with K.B. or D.M.
S.B., A.B.'s mother's sister, testified that, on the day of the incident, she picked up D.M. from A.B.'s mother's house and took her home with her. She explained that she had been taking care of D.M. since she was born, and that D.M. was like a granddaughter to her. She did not notice anything unusual that day, and D.M. made no complaints to her.
K.B., A.B.'s 10-year-old sister, testified that she was with D.M. the whole day and did not see A.B. touch D.M. improperly. K.B. admitted that she found the pornographic movies in her mother's closet, and that those movies depicted a woman sucking a man's penis. She testified that at no time were A.B. and D.M. alone in the room without her. She admitted that A.B. watched the movies for a little while, and then left.
A.B. testified that he told the detectives at his home that he wanted a lawyer. After they told him he did not have to say anything, he said "okay," and they took him to the detective bureau. When he got to the bureau, A.B. told them what happened, and Detective Vega told him he was lying. A.B. claimed that he told the detectives that D.M. sucked his penis because he said what they wanted him to say so he could go home. A.B. testified that he was not alone with D.M. at any time on the day in question, and that his sister, K.B., was always in the room. He admitted watching some of the pornographic movies and then leaving. He denied touching D.M. improperly. A.B. explained that Easley was in the living room while they were watching the movies, and that Easley did not know what they were doing.
In his first allegation of error, the juvenile argues, in effect, that the judge erred by denying his motion to suppress the statement. He contends that his statement was not freely and voluntarily given. He further contends that the judge failed to consider his lack of meaningful consultation with a concerned adult prior to giving the statement, and the impact of the coercive environment upon him without a protective adult present. The State responds that the judge did not abuse her discretion by denying the motion.
At the suppression hearing, Detective Kay Home, A.B.'s mother, and A.B. testified, and their testimony was virtually the same as their trial testimony. After hearing the testimony, the judge denied the motion, stating in pertinent part:
I find absolutely no misbehavior on the part of either of these Detectives. I think that the statement was taken, quote by the book. I don't find any *939 violations of the defendant's rights. I find that the statement was knowing and voluntary. I find that the mother was given an opportunity to speak, not only to the Detectives but to her son and that she willing [sic] allowed him to go with the Detectives to make a statement at the Bureau, ah after having been fully informed pursuant to the juvenile arrest of rights, the juvenile advise [sic] of rights form, therefore I deny the motion.
Before introducing a defendant's statement into evidence, the State must show that the statement did not result from fear, duress, intimidation, menace, threats, inducements or promises. LSA-R.S. 15:451; State v. Lucky, 96-1687, p. 26 (La.4/13/99), 755 So.2d 845, 855, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). Moreover, at the hearing on a motion to suppress a statement, the State bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the statement. LSA-C.Cr.P. art. 703.
"The constitutional privilege against self-incrimination and the right to counsel apply equally to juveniles and adults." State v. Terrick, 03-515, p. 9 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1159, writ denied, 03-3272 (La.3/26/04), 871 So.2d 346 (citations omitted). Thus, if the accused is in custody at the time of the statement, he must also have first been advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The determination of whether a waiver of constitutional rights is knowingly and voluntarily is made on a case-by-case basis and such a determination rests upon the "totality of the circumstances." State v. Fernandez, 96-2719, p. 7 (La.4/4/98), 712 So.2d 485, 487. In addition to age, some factors that have been considered in assessing the totality of the circumstances include the accused's experience, education, background, intelligence, and capacity to understand the warning given at the time of the waiver. State v. Terrick, 03-515 at p. 10, 857 So.2d at 1159 (citations omitted).
The admissibility of a statement or confession is a question for the trial court, and its conclusions on the credibility and weight of testimony relating to voluntariness of a statement will not be overturned on appeal unless not supported by the evidence. State v. Terrick, 03-515 at pp. 10-11, 857 So.2d at 1159-60. In reviewing the correctness of the trial court's ruling on the motion to suppress, the appellate court is not limited to evidence adduced at the hearing on the suppression motion, but may also consider pertinent evidence given at trial. State v. Manson, 01-159, p. 6 (La.App. 5 Cir. 6/27/01), 791 So.2d 749, 755, cert. denied, 01-2269 (La.9/20/02), 825 So.2d 1156.
The juvenile cites State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978), to support his position that his statement was not voluntary because he did not have a meaningful consultation with an interested adult prior to giving the statement. In Dino, a prophylactic rule required that "the juvenile actually consulted with an attorney or an adult before waiver, that the attorney or adult consulted was interested in the welfare of the juvenile, or that, if an adult other than an attorney was consulted, the adult was fully advised of the rights of the juvenile." However, as the State correctly pointed out in brief, Dino was overruled by State v. Fernandez, supra, which reinstated the totality of the circumstances standard as the basis for determining the admissibility of juvenile confessions.
*940 In the instant case, we find that the judge did not err by denying the motion to suppress the statement. Considering the totality of the circumstances, we believe that the juvenile's confession was freely and voluntarily given. The record shows that the detectives advised the juvenile and his mother of the juvenile's rights at their residence, including the right to remain silent and to talk to a lawyer. The record further shows that the juvenile and his mother signed and initialed the juvenile waiver of rights form showing that they understood those rights. Prior to giving the statement at the detective bureau, the juvenile was again advised of his rights and waived them, indicating he wanted to give a statement. Detective Horne stated that the juvenile was not threatened or physically touched in a forceful way, and that no promises were made to him before he gave his statement. The record also reflects that Detective Horne was not armed during her interview of the juvenile. Additionally, the juvenile said at the end of his statement that he was not threatened to give the statement, that he was treated fairly, and that he gave the statement of his own free will.
The juvenile and his mother were made aware of the fact that this was a very serious case involving an aggravated rape allegation which could possibly result in the juvenile receiving a sentence of juvenile life. Although the juvenile's mother testified that she did not think the situation was a "big deal," she nevertheless admitted that she was previously made aware of the circumstances surrounding the allegation by the victim's mother who confronted her at her place of employment prior to going to the police. Although the juvenile and his mother claimed that they both asked to speak to a lawyer, Detective Horne testified that that claim was untrue. The judge apparently found the State witness more credible than the juvenile and his mother.
Even though A.B. was a 14-year-old juvenile at the time of the statement, this factor alone would not negate the voluntariness of his statement. He had an eighth-grade education, and the circumstances do not indicate he was unable to understand the nature of his actions. Additionally, the testimony of A.B.'s mother at the suppression hearing indicates that the juvenile had been to court previously on other charges, and that each time, A.B. had a court appointed attorney to represent him. A.B.'s mother further indicated that, if she was going to call somebody for legal assistance, she would have called A.B.'s court appointed attorney, Michael Idoyaga.
Further, before adjudicating the juvenile delinquent for aggravated rape, the trial judge noted:
I heard the tape [of the statement]. It just wasn't a question of reading the transcript, it was hearing his voice on the tape, hearing his demeanor and he did not sound coerced, he did not sound flustered, he did not sound upset.
A review of the tape recording of the statement corroborates the judge's findings with regard to the tone of A.B.'s voice and his demeanor.
The judge did not err by denying defendant's motion to suppress the statement, and therefore this allegation lacks merit.
In his second allegation of error, A.B. argues that the mandatory minimum sentence of juvenile life imposed by the judge was constitutionally excessive because the offense was not violent, D.M. was not harmed and appeared to suffer no residual effects, there was no indication that he was a sexual predator, and the offense, if it did occur, was an impulsive and random act. He notes that the judge *941 found that his actions were more consistent with oral sexual battery, and that she reluctantly adjudicated him delinquent of aggravated rape.
The juvenile further argues that the disposition conflicts with the obligation of the judge to impose the least restrictive disposition which the court finds is consistent with the circumstances of the case, the needs of the child, and the best interests of society pursuant to LSA-Ch.C. art. 781. He requests a remand for the full dispositional hearing required by LSA-Ch.C. art. 765, et. seq., and an instruction to the judge that she has the ability to impose a lesser disposition. The State responds that a departure below the mandatory minimum sentence is not warranted.
Prior to imposing the sentence, the judge stated in pertinent part:
You know where the State could have, I guess charged him with oral sexual battery, they choose [sic] to charge him with aggravated rape and quite frankly the elements do indeed fit the Statute. And I think there is no question, I do not have a doubt in my mind that this occurred and accordingly I, as loathe as I am to find a child guilty of a crime which gives me no discretion and sentencing him to Juvenile life, that is what my duty to do in this case.
After the juvenile waived sentencing delays, the judge said that, pursuant to LSA-Ch.C. art. 897.1, she was "required by law" to sentence him to the Office of Youth Development until his 21st birthday without benefit of parole, probation, or suspension of sentence. Afterwards, the judge stated:
This Court does not have discretion in this sentence. I, I, I, there is no need for me to make a finding of reasonable efforts because this is what the law requires me to do.
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive or cruel punishment. A sentence is excessive if it is grossly disproportionate to the seriousness of the offense so as to shock our sense of justice, or if it imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Brown, 01-160, p. 14 (La.App. 5 Cir. 5/30/01), 788 So.2d 667, 674.
Despite having received the mandatory minimum sentence, a defendant's sentence may be reviewed for constitutional excessiveness. State v. Brooks, 04-779, p. 9 (La.App. 5 Cir. 11/30/04), 889 So.2d 1064, 1070, citing State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. However, it is presumed that a mandatory minimum sentence is constitutional. State v. Brooks, 04-779 at p. 9, 889 So.2d at 1070, citing State v. Dorthey, 623 So.2d 1276 (La.1993). A court may only depart from the mandatory minimum sentence if it finds that there is clear and convincing evidence in the particular case before it which would rebut this presumption of constitutionality. State v. Johnson, 97-1906, p. 7 (La.3/4/98), 709 So.2d 672, 676. To rebut the presumption that the mandatory minimum sentence is constitutional, defendant must show that:
[H]e is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances.
State v. Johnson, 97-1906 at p. 8, 709 So.2d at 676.
We first consider whether a juvenile court judge can deviate below the mandatory minimum sentence set forth in LSA-Ch.C. *942 art. 897.1 when a juvenile has been adjudicated delinquent of aggravated rape.
LSA-Ch.C. art. 897.1 provides the disposition rules for aggravated rape and other enumerated felonies:
A. After adjudication of a felony-grade delinquent act based upon a violation of . . . R.S. 14:42, aggravated rape . . . the court shall commit the child who is fourteen years or older at the time of the commission of the offense to the custody of the Department of Public Safety and Corrections to be confined in secure placement until the child attains the age of twenty-one years without benefit of parole, probation, suspension of imposition or execution of sentence, or modification of sentence.
In State in the Interest of A.A.S., 30,775 (La.App. 2 Cir. 4/8/98), 711 So.2d 319, writ granted and decision vacated, 98-1505 (La.10/16/98), 726 So.2d 900, the juvenile was adjudicated delinquent for committing aggravated rape. The trial court sentenced the juvenile to a term less than the mandatory sentence of Ch.C. art. 897.1. On appeal, the Second Circuit reversed, and remanded the matter for the entry of a judgment of disposition consistent with LSA-Ch.C. art. 897.1. In so doing, the appellate court discussed the law regarding dispositions after adjudications for aggravated rape, stating that the "general disposition guidelines [Ch.C. art. 901 B] do not apply when a child has been adjudicated a delinquent for the violation of aggravated rape. Ch.C. art. 901 E." Id., 30,775 at p. 8, 711 So.2d at 324. On writ of review, the Louisiana Supreme Court vacated the decision of the appellate court and remanded the case to the juvenile court for reconsideration of its disposition according to the criteria set forth in State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. State in re A.A.S., 726 So.2d at 900.
The decision of the Louisiana Supreme Court in State in the Interest of A.A.S., supra, indicates that a juvenile court judge has the authority to deviate below the mandatory minimum sentence set forth in LSA-Ch.C. art. 897.1 A when a juvenile has been adjudicated delinquent of aggravated rape.
In the instant case, the juvenile court judge erred when she said she had no discretion in sentencing A.B. to juvenile life, the mandatory minimum sentence set forth in LSA-Ch.C. art. 897.1. We therefore vacate the sentence and remand to the juvenile court for reconsideration of its disposition according to the criteria set forth in State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672. See State v. Washington, 00-301, pp. 11-13 (La.App. 5 Cir. 9/27/00), 769 So.2d 1235, 1241-42, writs denied, 00-2971 (La.9/28/01), 798 So.2d 106 and 00-3041 (La.9/28/01), 798 So.2d 108.
We have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir.1990), and find the following which require our attention.
The judge did not inform A.B. of the prescriptive period for seeking post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8. We recommend that the juvenile court inform the juvenile of the delays for post-conviction relief in writing and file proof of the notice in the record, State ex rel. T.S., 04-1111, p. 9 (La.App. 5 Cir. 3/1/05), 900 So.2d 77, 82, at resentencing.
For the following reasons, the adjudication of A.B. as a delinquent for aggravated rape is affirmed. The sentence is vacated and the case is remanded to the juvenile court for reconsideration of its disposition according to the criteria set forth in State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672.
*943 ADJUDICATION AS DELINQUENT AFFIRMED; DISPOSITION REVERSED; CASE REMANDED.
NOTES
[1] The initials of the victim and those of certain family members are used under the authority of LSA-R.S. 46:1844(W)(3), which allows the court to protect the identity of a crime victim who is a minor or a victim of a sex offense by using his or her initials. State v. Greene, 06-667 (La.App. 5 Cir. 1/30/07), 951 So.2d 1226, 1239, writ denied, 07-0546 (La.10/26/07), 966 So.2d 571.